**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION**

UNITED STATES OF AMERICA
for the use and benefit of
HAMPTON ROADS MECHANICAL
CONTRACTORS, INC.,

                Plaintiff,

v.                            Civil Action No.: 4:06cv64

METROTEC ASSOCIATES, INC.,

and

WESTERN SURETY COMPANY,

                Defendants.

### OPINION AND ORDER

    This matter was referred to the undersigned United States Magistrate Judge, by order dated July 18, 2006, and with the consent of the parties, pursuant to the provisions of 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. For the reasons stated herein, the Court ENTERS JUDGMENT for Defendant, Metrotec Associates, Inc., in the amount of $29,929.67.

### I. PROCEDURAL BACKGROUND

    Plaintiff, Hampton Roads Mechanical Contractors, Inc. (hereinafter "HRMC"), brought the instant lawsuit against Defendants, Metrotec Associates, Inc. (hereinafter "Metrotec"), and Western Surety Company (hereinafter "Western Surety"), to recover on amounts allegedly owed to HRMC by Metrotec on a subcontract

between HRMC and Metrotec.

This action commenced when HRMC filed the instant complaint, naming Metrotec and Western Surety as defendants, in this Court on May 12, 2006.  The subcontract at issue involved work to be performed by HRMC, as subcontractor to Metrotec, the prime contractor on a construction project for the United States of America at the Coast Guard Station located in Yorktown, Virginia, which is within the venue limits of the Eastern District of Virginia, Newport News Division.  This Court has proper jurisdiction over the controversy pursuant to the Miller Act, 40 U.S.C. § 3131, et seq.  In the complaint, HRMC alleged that Metrotec's refusal and failure to make payment to HRMC was a breach of the subcontract, which damaged HRMC in the amount of $41,371.67. The instant suit was filed within one (1) year, but more than ninety (90) days after the last date on which HRMC performed labor or furnished or supplied materials to the construction project.

Defendants, Metrotec and Western Surety, filed answers to the complaint on June 7, 2006.  (Document Nos. 4 and 5.)  On July 18, 2006, both parties consented to the referral of this matter to the undersigned United States Magistrate Judge.  (Document No. 8.)  By agreed order, entered October 23, 2006 (Document No. 12) ("Agreed Order"), the parties indicated their mutual agreement on all but a single issue in the case.  In that order, the parties stipulated to

2

a  number  of  facts,[1]  narrowing  the  issue  for  the  Court's

consideration to the quantification of the savings associated with

———————————

[1]Specifically, the facts stipulated by the parties included:

> 1.   Defendant   Metrotec   Associates,   Inc.
> (hereinafter "Metrotec") entered into a contract
> with   the   United   States   to   perform   certain
> improvement  as  a  prime  contractor  for  a  project
> known  as  Pier  YK-200,  Repairs  to  Pier,  Yorktown,
> Virginia.
> 2.   Metrotec,  as  principal,  and  Western  Surety
> Company,  as  Surety,  provided  a  Standard  Form  25A
> Payment  Bond,  in  the  penal  sum  of  $2,721,374.69,
> pursuant  to  contract  terms  of  the  project  and  the
> Miller Act, 40 USC [sic] § 3131, et. seq.
> 3.   Metrotec   entered   into   a   subcontract   with
> Hampton   Roads   Mechanical   Contractors,   Inc.
> (hereinafter  "HRMC")  regarding  a  portion  of  the
> work on the project.
> 4.   HRMC performed all of its subcontract work.
> 5.   Metrotec  paid  HRMC  the  subcontract  sum  less  a
> $29,929.67 retainage.
> 6.   One  aspect  of  HRMC's  subcontract  work  was
> demolition of certain fuel lines.
> 7.   It  was  originally  envisioned  by  the  parties
> that  HRMC  would  utilize  the  "cold  cut"  technique
> when demolishing the fuel lines.
> 8.   Thereafter,  the  parties  agreed  that  HRMC  would
> demolish  the  fuel  lines  utilizing  the  "hot  cut"
> technique.
> 9.   HRMC  utilized  the  "hot  cut"  technique  to
> demolish the fuel lines.
> 10.  To  the  extent  that  the  change  from  "cold  cut"
> to  "hot  cut"  generated  savings  in  cost,  the  parties
> agree  that  Metrotec  is  entitled  to  offset  such
> savings  in  cost  against  the  $29,929.67  contract
> balance retained by Metrotec.

Agreed Order, at 1-2.  Hereinafter, the Court will denote these
stipulations of fact collectively as "the Stipulations," but will
refer to each individual stipulation according to the number as
presented by the parties in the Agreed Order (e.g., "Stipulation
No. 1," "Stipulation No. 2," etc.)

the change from the "cold cut" technique to the "hot cut" technique
with respect to demolition of the fuel lines on the Pier YK-200
project.  (Agreed Order, at 2.)  The parties consented to a bench
trial on that issue, and the bench trial took place on December 8,
2006, and December 19, 2006.  (Document Nos. 14, 15, 19, 20.)  Both
parties offered into evidence numerous documents and exhibits,[2] and
each party called witnesses to testify on its behalf.[3]  Also, the
testimony of Dennis Harvey Cobb was offered  and received into
evidence in the form of a _de bene esse_ deposition.[4]  (Document Nos.

---

[2]The parties submitted a notebook to the Court including
various "Joint Exhibits" numbered 1 through 42 (bearing Bates
Labels, "Metrotec 1" through "Metrotec 285"), and each party
submitted their respective trial exhibits: Metrotec's trial
exhibits were numbered 1 through 12 (bearing various Bates Labels,
including "Metrotec 17" through "Metrotec 340") (hereinafter
"Def.'s Exh."), and HRMC's trial exhibits were numbered 1A-E
through 3 (hereinafter, "Pl.'s Exh.").  There were also certain
demonstrative exhibits provided for the Court's benefit to
illustrate the various calculations involved in the instant
analyses.

[3]Each party called three (3) witnesses to testify on its
behalf.  HRMC, the plaintiff, called Timothy Wayne Nixon, a field
foreman for HRMC; James Garland King, a field
foreman/superintendent for HRMC; and Patricia Carol McFann, a
project manager for HRMC.  Metrotec, the defendant, called William
Curtis Merritt, an engineer/construction manager who was hired as
a cost-estimator by Metrotec; Raj Gowda, a project
manager/superintendent/quality control manager for Metrotec; and
Ramachandra ("Ram") Gowda, the owner of Metrotec.

[4]HRMC originally moved to take Cobb's deposition outside of
this District (Document No. 12) because Cobb was working on a
construction project in Florida.  The parties apparently agreed to
the taking of that deposition, which occurred on December 6, 2006,
with both counsel participating by telephone.  Insofar as the
deposition was taken by agreement, the Court DENIES the motion as
MOOT.
   The deposition transcript and the deposition summary were

16-18.)  On December 19, 2006, Metrotec made an oral motion for partial summary judgment on the issue of the quantification of costs incurred in using the "hot cut" method.[5]  (Document No. 15; Tr. 174-80.)  The Court deferred any ruling on the motion at that time, and instead took the matter under advisement.  (Tr. 180-81).  Final oral arguments took place on February 9, 2007 (Document No. 21), at which point the Court afforded HRMC an opportunity to offer further argument in response to Metrotec's oral motion for partial summary judgment.  Now, for the reasons stated herein, the Court DENIES Metrotec's motion for partial summary judgment as MOOT, and the Court FINDS that HRMC is entitled to none of the retainer and

---

offered into evidence, however, by Metrotec (Tr. 181-82; Document Nos. 16, 17).  On December 26, 2006, HRMC filed its objections and supplement to the deposition summary of Cobb (Document No. 18).

[5]Specifically, Metrotec argued that HRMC had failed to establish with the requisite specificity what portion of the labor costs to perform the demolition work were attributable only to the hot-cutting operations, as opposed to the labor involved in performing other related-but-separate demolition work.  (Tr. 174-76, 179-80.)  In support of this motion, Metrotec offered a 1993 decision by the Supreme Court of Virginia, TechDyn Systems Corp. v. Whittaker Corp., 245 Va. 291, 296 (1993) (recognizing the principle that "where there is evidence of damage from several causes, for a portion of which a defendant cannot be held liable, a plaintiff must present evidence that will show within a reasonable degree of certainty the share of damages for which that defendant is responsible," and holding that the general contractor had "met its prima facie burden of producing evidence to show with a reasonable degree of certainty the share of damages and delay for which [the subcontractor] was responsible.").  (Tr. 176.)  In response, HRMC argued that the hot-cutting work was the "critical path" in the demolition work, in both phases, thus it was inappropriate to separate the cutting work from the other demolition work in Phase 2.  (Tr. 177-79.)

further FINDS that Metrotec is entitled to the entire balance of the retainer.  Accordingly, the Court hereby ENTERS JUDGMENT for Metrotec in the amount of $29,929.67.

## II. **FACTUAL BACKGROUND**

Metrotec entered into a contract with the United States to perform certain improvements as a prime contractor for a project known as Pier YK-200, Repairs to Pier, Yorktown, Virginia. (Stipulation, No. 1.)  On or about September 15, 2004, Metrotec, as principal, and Western Surety, as surety, provided a Standard Form 25A Payment Bond, in the penal sum of $2,721,374.69, pursuant to contract terms of the project and the Miller Act, 40 U.S.C. § 3131, et seq.  (Stipulation, No. 2.)

Metrotec entered into a subcontract with HRMC regarding a portion of the work on the project.  (Stipulation, No. 1.)  One aspect of HRMC's subcontract work was demolition of certain fuel lines at Pier YK-200.  (Stipulation, No. 6.)  It was originally envisioned by the parties that HRMC would utilize the "cold cut" technique when demolishing the fuel lines (Stipulation, No. 7), which involved the use of a mechanical saw to cut the lines. Thereafter, however, the parties agreed that HRMC would demolish the fuel lines utilizing the "hot cut" technique (Stipulation, No. 8), which involved use of a torch to cut the lines.  HRMC utilized

6

the "hot cut" technique to demolish the fuel lines.[6] (Stipulation, No. 9.)   After HRMC performed all of its subcontract work (Stipulation, No. 4), Metrotec paid HRMC the subcontract sum less a $29,929.67 retainage (Stipulation, No. 5). Metrotec claimed the retainage amount represented the savings it was due from the contract, based on the lowered costs incurred by HRMC to "hot cut" the piping instead of using the "cold cut" technique.  HRMC claimed that Metrotec was not entitled to the retainage because minimal savings were achieved by using the "hot cut" technique.   The parties did agree, however, that to the extent the change from the "cold cut" method to the "hot cut" method generated a savings in cost, Metrotec is entitled to offset such savings in cost against the $29,929.67 contract balance retained by Metrotec. (Stipulation, No. 10.)

### III. **ANALYSIS**

The Court commends both parties for reducing a complicated and fact-filled case to a single issue: quantifying the savings

---

[6]The Court notes that while the vast majority of the project was completed by HRMC using the "hot cut" technique, including all of the demolition work in that portion of the project at issue here, the "cold cut" technique was used by HRMC to perform a small number of cuts on a shorter section of pipe at the end of the pier. That additional work, which was outside the scope of work in the original subcontract at issue here, was authorized by Metrotec in the form of a change order to the original subcontract; the number of labor hours involved in performing that additional work using the "cold cut" technique was used by the parties in attempting to calculate an estimate of what the costs would have been if the instant work had been performed using the "cold cut" technique. See infra.

associated with the change from the "cold cut" technique to the "hot cut" technique with respect to the demolition of the fuel lines on the Pier YK-200 project.  (Agreed Order, at 2.)   The parties appear to agree there were <u>some</u> savings associated with that change,[7] <u>see infra</u>, and the parties have stipulated that Metrotec is entitled to retain any such savings, <u>see supra</u>.  This stipulation has essentially eliminated the major legal issues from the Court's consideration, allowing the Court to focus on the aforementioned issue of fact.  This analysis necessarily requires the Court to weigh the evidence, drawing all reasonable inference therefrom, assess the credibility of witnesses, and make factual findings, all of which are within the Court's purview.   <u>United</u>

---

[7]The Court notes that the testimony of the various witnesses for each party differed on explaining the motivation behind the change from the "cold cut" technique to the "hot cut" technique. Metrotec attempted to show that the change in technique was proposed because of the potential for significant cost savings due to the lower labor costs involved in cutting the pipes with a torch as opposed to with a pneumatic saw.  Metrotec also argued that there must have been significant cost savings in making the change because in order to use the "hot cut" method, it was required to perform a procedure called "pigging out" the pipes (a technique in which a plunger-like device is inserted into the pipes to remove any excess fuel before the torch is ignited for the cutting, thereby preventing a fire hazard), which cost on the order of $100,000.00.  The witnesses for HRMC did not subscribe to this argument, and even went so far as to suggest that the costs savings were minimal.

Insofar as the parties have stipulated to virtually all the salient facts, and the parties have agreed that the instant matter can be reduced to a single issue, the Court need not probe further into the motivation for making the change from the "cold cut" to the "hot cut" technique.  The only issue for the Court to resolve is the quantification of the cost savings, if any, achieved by making that change.

<u>States v. Bales</u>, 813 F.2d 1289, 1293 (4th Cir. 1987) ("the judge [in a bench trial] weighs the evidence, determines the credibility of witnesses, and finds the facts . . . [and] may select among conflicting inferences to be drawn from the testimony.")  To assist the Court, each party has provided its suggested method(s) for quantifying the cost savings.  Not surprisingly, the results provided by those methods are widely divergent.

### A. <u>Defining the Cost Parameters</u>

It appears to the Court that the most straightforward way to perform the analysis is to determine the cost associated with each technique, calculate the difference in those costs, and determine to what extent, if any, that difference exceeds the $29,929.67 contract retainage held by Metrotec.  This analysis necessarily requires the Court to determine a reasonable value for the cost of each cutting technique.  Despite the apparent simplicity of this analysis, however, the calculations are more difficult to perform than would be imagined.

In the first instance, HRMC wants to show that minimal savings resulted from using the "hot cut" method instead of the "cold cut" method.  From HRMC's perspective, therefore, the lower the savings, the greater the portion of the $29,929.67 retainer that HRMC is entitled to.  To prove the lowest savings possible, HRMC seeks to establish the "hot cut" cost to be as high as possible, and the "cold cut" cost to be as low as possible.  HRMC concluded that

using the "hot cut" method to cut the pipes cost a total of $19,875.87. HRMC estimates that had the "cold cut" method been used to cut the piping, the total cost would have been $23,545.50. Using these two values, therefore, HRMC argued that it saved only $3,669.63 by hot-cutting the pipes in place of cold-cutting. Therefore, subtracting the amount saved, $3,669.63, from the retainer amount of $29,929.67, HRMC seeks to recover $26,260.04.

Metrotec, on the other hand, seeks to do just the opposite. Metrotec wants to prove the highest savings possible resulted from the switch to the "hot cut" technique from the "cold cut" technique, thus allowing Metrotec to keep the greatest portion of the retainer possible. Thus, Metrotec wants to show as high a "cold cut" cost as possible, and the lowest "hot cut" cost possible. Metrotec concluded that using the hot cut method to cut the pipes cost a total of only $11,848.40.[8] Metrotec estimated the total cost of the "cold cut" method using three different techniques. Metrotec therefore determined that had the "cold cut" method been used to cut the piping, the total cost would have ranged from $59,917.52 to $63,398.88. On this basis, Metrotec concluded that it is entitled to retain the entire $29,929.67

---

[8]The Court notes that in so doing, Metrotec used HRMC's cost estimate for the "hot cut" work, $19,875.87, as the starting point in preparing its own cost estimate. Metrotec then reduced that figure by a certain amount because Metrotec argued that HRMC failed to establish that certain costs included in HRMC's cost estimate were in fact attributable to the "hot cut" work. See infra, Section III.C.3.

because, using any one of Metrotec's "cold cut" method values, an amount greater than $29,929.67 was saved by hot-cutting the pipes in place of cold-cutting.  Therefore, Metrotec seeks to retain the entire amount of the $29,929.67 retainer.

In the instant case, the Court has identified a reasonable basis for estimating the costs in this case without determining a precise value for the cost of the "hot cut" and "cold cut" techniques.  This method involves using portions of the various cost proposals made by the parties, including consideration of those cost figures that the parties do agree on, to "bound" the problem and determine what amount of the retainer, if any, to which HRMC is entitled.  First, because the parties appear to agree that $19,875.87 is the maximum cost for performing the "hot cut" work, see infra, Section III.C and note 31, the Court can assume for the present purposes that this represents the cost of performing the hot-cutting.  Then, using this assumed value, if the Court determines that the cost of performing the cold-cutting is greater than or equal to $49,805.54, the sum of the "hot cut" costs ($19,875.87) plus the retainer amount ($29,929.67), then Metrotec is entitled to receive the entire amount of the retainer.  To the extent that the costs of the "cold cut" work is less than $49,805.54, however, the Court would need to perform additional calculations to determine what portion of the retainer HRMC is entitled to receive.

## B. <u>The Demolition Operation</u>

To better understand the process for determining the cost parameters, the Court first explains the various steps involved in the demolition operation. The demolition process involved the removal of two (2) fuel lines that run adjacent to the pier. (Tr. 49.) The fuel lines comprised an 18-inch pipe and a 14-inch pipe (Tr. 49-50); each line was approximately 2,800 feet long, constructed of a series of pipe sections, approximately 250-300 feet in length, connected serially by a number of expansion joints (Tr. 52-53). To perform the removal of the fuel lines, it was decided to cut the various pipe sections (between the expansion joints) into approximately 40-foot long segments so that each cut segment of pipe could be loaded onto a barge (to facilitate transport from the pier). (Tr. 50.) Given the total length of pipe, there would have been approximately 140 cuts on each size of pipe to produce the intended 40-foot sections. The testimony revealed, however, that the pipes were not always cut in exactly 40-foot sections because local conditions along the length of the pipes (e.g., bend in the pipe, location of the expansion joints) were not always conducive to making a cut at exactly the 40-foot mark. (<u>See generally</u>, Tr. 40-42, 50-53, 67-68.) As a result, though the exact number of cuts made on the fuel lines is not known, the testimony suggests it ranges between 136 to 144. <u>See also infra</u>, note 19.

Clearly, the cutting operations constituted the predominant and most labor-intensive efforts on the project.   However, the evidence before the Court suggests that there were a number of other work items involved in the demolition apart from the actual cutting of the pipe.   (<u>See generally</u>, Tr. 50-52, 77-78, 87-88, 103-04.)   These included installing the necessary rigging to support each section of pipe after each cut had been made, removing the various expansion joints along the length of the pipe, covering each end of the pipe with plastic bags and tape to prevent fuel leakage, cutting various anchor bolts and supports beneath the pipe, and loading each cut section of pipe onto the barge for removal of the pipe from the vicinity (collectively referred to herein as "the appurtenant work").   <u>Id.</u>   The evidence further suggests that virtually all of the appurtenant work would have been required to complete the demolition whether HRMC had used the "hot cut" technique or the "cold cut" technique.   (<u>See</u> Tr. 130-32.)   In other words, regardless of which cutting technique was used, essentially the same appurtenant work would have been required to safely remove the pipe and complete the project.   Consequently, in performing the instant analysis, the Court's focus is necessarily directed to isolating the costs of the cutting operations (whether by hot-cutting or by cold-cutting) from the other related costs.

## C. <u>Determining the "Hot Cut" Costs</u>

The Court first examines the cost for the "hot cut" technique.

Even though the "hot cut" technique was actually used by HRMC and there are labor and payment records submitted by HRMC to Metrotec associated with the work actually performed, the "actual cost" for this technique remains difficult to ascertain. Based on the evidence before the Court, those labor and payment records are not prepared with the necessary precision to isolate the cost of "hot-cutting" the pipe from the other work necessary to complete the demolition work as required in the subcontract at issue. In particular, the labor and payment records associated with the hot-cutting of the pipe that was actually performed by HRMC did not specifically differentiate between the cutting operations and the appurtenant work (See generally, Tr. 57-60, 83-88, 102-05);[9] those

---

[9]The Court notes that these records were based on a series of daily reports by the project manager, Jim King ("King"), to document the work performed each day. (Tr. 57-58; Pl.'s Exh. 1.E.) King kept a "daily log" for the time period between March 4th through April 19th (Tr. 57); that log comprised two (2) handwritten pages with brief notations indicating the work performed each day. (Pl.'s Exh. 1.E.) For example, the notations on March 10 and March 22 read simply, "Burning on main pier" and "Demolition towards & under loading arms," respectively. Id. at 1. King also prepared a series of forms, entitled "Daily Foreman's Diary," where he testified that he "copied down what I had written in my [daily] log[,] . . . [t]o make it easier to read. My handwriting is not very good." (Tr. 57-58; Pl.'s Exh. 1.E, at 3-17.) The diary forms contained essentially the same description of the work performed each day, along with a documentation of the hours worked by each member of the HRMC work crew. However, there was no breakdown of the number of hours devoted to the cutting operations as opposed to other work involved in the demolition project.

The Court further notes there is nothing in the record to suggest the parties anticipated litigation over the instant issue, thus there appears to have been no reason to document the work performed with the specificity required to assist the Court in its analysis here.

14

records generally referred to the work in the collective sense, without any attempt to separate the work associated with the cutting operations (as would be required to accurately perform the instant analysis) from the appurtenant work.[10]  As such, the Court would be required to make certain assumptions to obtain a precise cost estimate for the "hot cut" technique.

### 1. HRMC's "Hot Cut" Cost Estimate

As discussed, determining the actual costs of the "hot cut" method has proved difficult.  Because both parties anticipated using the "cold cut" method at the formation of the contract, no cost estimate of the "hot cut" method was prepared.  HRMC performed the demolition work using the "hot cut" method and billed Metrotec accordingly, and Metrotec paid HRMC for that work.  However, to determine the actual value of the "hot cut" method would require separating the cost for purely doing the hot-cutting from the remainder of the appurtenant work.

HRMC has determined that the cost of the "hot cut" method was $19,875.87.  (Pl.'s Exh. 1.A.)  HRMC based its determination on an analysis by Patricia McFann (hereinafter "McFann").  McFann has worked for HRMC for over 13 years and currently holds the title of Project Manager.  (Tr. 91-94.)  McFann, to produce her estimate of

---

[10]The Court notes that this point forms the basis for Metrotec's partial motion for summary judgment, in which Metrotec argued that HRMC had failed to establish with the requisite specificity the amount of certain costs associated with the hot-cutting of the fuel lines.  See supra note 5.

the "hot-cut" method, used computer-documented records on labor costs, various material and equipment rental invoices, and finally substantiated those findings with the foreman's records and the overall job performance methodology.  (Tr. 101-02; <u>See generally</u>, Pl.'s Exh. 1).

McFann assessed the labor costs of the "hot cut" method by dividing the project's cutting time period into two phases.  (Tr. 103).  Phase I lasted from March 9 to March 17, 2006, and Phase II lasted from March 18 to March 30, 2006.  (Tr. 103.)  The bulk of the cutting operations occurred in Phase I, during which HRMC cut each pipe approximately ninety-five percent (95%) of the way, leaving the remaining five percent (5%) of the pipe uncut.[11]  (Tr. 58-59, 75-76.)  The remaining five percent (5%) of the pipe was not cut until Phase II.  (Tr. 59-60, 73-74.)  The cutting operations were performed in this fashion because the pipe needed to be self-supported until the open ends of the pipe could be sealed shut, artificial supports could be placed to support the pipes, and the piping could be removed in a safe and environmental-friendly manner.  (Tr. 50-51.)  In addition to completing the remaining cutting, during Phase II HRMC also performed the appurtenant work in support of the continuing demolition of the piping and the

---

[11]McFann testified that, during Phase I, while "[the foreman] may have been reworking some other things, [] most of that [Time Frame 1] was doing the initial cutting and protecting and taping up those cuts."  (Tr. 104).

removal of the piping and its anchors and supports.

McFann also relied upon the labor records of Jim King ("King"), the working foreman of the project. (Tr. 102-04.) Using these records, McFann determined that during Phase I, 219 hours of labor were expended. (Tr. 136.) McFann testified that while other minor work may have been done during Phase I, the vast majority of Phase I was used to make the numerous cuts that penetrated through ninety-five (95%) of each pipe's diameter. (Tr. 136-37.; Def.'s Exhibit 1.A.) During Phase II, when the remaining five percent (5%) of the cuts were made, King's labor records showed 210 hours of labor. Id. Again, it appears that in keeping these records there was never any intention or consideration given to separating the labor associated with the cutting operations from other related parts of the demolition.[12] McFann used these documented hours of labor for both phases of the demolition in reaching her calculation of the costs of the "hot cut" method of $19,875.87. (Tr. 115-16.)

---

[12]Although it is unclear as to the number of hours that were expended during Phase II for actual hot-cutting of the pipe, it was conceded by McFann that the great majority of the cutting was done during Phase I. (Tr. 137). This coincides with the testimony of King, the project manager, who conceded that hot-cutting "was just a small part of what was going on during the second phase [of the demolition]." (Tr. 78.) This is also evidenced by, once again, the percentage of the pipe that was cut in each phase and a comparison of the hours of labor expended in each phase: 95% of the pipe was cut in Phase I, which included 219 hours of labor, and the remaining 5% of the pipe was cut in Phase II, which included 210 hours of labor. Therefore, it stands to reason that the percentage of time devoted to cutting in the second phase was significantly lower than that in the first phase.

HRMC, however, has not been able to determine a specific number of hours of the 210 hours of labor in Phase II that is attributable solely to cutting.  While McFann testified on direct examination that the portion of the 210 hours attributable to actual cutting should have been determinable from the foreman's logs that he kept on a daily basis (Tr. 103-04), the Court finds the foreman's daily diary notes to be brief, general, and inconclusive as to the number of hours attributable solely to cutting the pipe.  (See supra, note 9; Pl.'s Exh. 1.E.) Significantly, McFann admitted during cross-examination that she was unable to "break-out" or itemize the number of hours out of the 210 hours that was devoted to actual cutting work.[13]  (Tr. 136). Metrotec therefore argued that the entire 210 hours of labor during Phase II should not be included in the cost estimate of the actual cutting, and thus would significantly reduce HRMC's "hot cut" method estimate.

## 2. Metrotec's "Hot Cut" Cost Estimate

In determining the costs of using the "hot cut" method to cut the pipeline, Metrotec began with HRMC's value of $19,875.87. Metrotec, however, argues for the removal of the costs for the 210 hours of labor from Phase II based on its cross-examination of

---

[13]McFann conceded on cross-examination that while the 210 hours of labor in Phase II included the rigging, sealing, and supporting of the pipes, she was unable to itemize the number of hours out of the 210 hours that was devoted to actual cutting work.  (Tr. 134-36).

McFann, which produced Metrotec's "hot cut" cost estimate of $11,848.40. (See generally, Tr. 134-46.) Metrotec claimed that this Phase II figure of 210 hours necessarily included the amount of time expended to complete the entirety of the demolition work (i.e. set-up time, removing the pipes, and take-down time), not just the cutting time. (Tr. 135-36.) Metrotec alleged that the entirety of the demolition work, as opposed to the actual cutting, would have been performed anyway, regardless of whether the "hot cut" or "cold cut" method was used to cut the piping. Because this demolition work had to be done no matter which cutting method was used, Metrotec argued any demolition work beyond the actual cutting should not be used in calculating the difference between the two cutting methods. (Tr. 130-31.) In other words, Metrotec asserts that eliminating the labor associated with the non-cutting demolition work would leave a single factor to consider when comparing the two cutting methods: the amount of time attributable solely to cutting the pipes.[14]

---

[14]HRMC, in its de bene esse deposition of Dennis Cobb (hereinafter "Cobb"), set the stage for such an analysis of comparing only the times attributable to actual cutting. McFann also acknowledged in her testimony that the work included in Cobb's estimate was strictly for cold-cutting. (Tr. 130). Although Dennis Cobb is not an employee of HRMC, he provided on behalf of his company, Pipeline Petroleum Services, Inc., an estimate to HRMC of his anticipated costs of cold-cutting the pipes. (Pl.'s Exh. 2.A. This estimate came to $33,741.94. Id. While Cobb's estimate included a one-half (.5) hour of prep-time for each cut (e.g., after each cut, disengaging the saw, moving it to the next cut location, and re-engaging the saw), the estimate anticipated that both the pipelines would be ready-to-cut on arrival and the removal

### 3. Metrotec's Motion for Partial Summary Judgment

At the trial on December 19, 2006, Metrotec made an oral motion for partial summary judgment on this issue: arguing that because most of the 210 hours of labor expended in Phase II was attributable to work other than cutting, things that would have had to have been done anyway, regardless of whether the pipes were hot- or cold-cut, such as the rigging, plastic, and supporting of the pipe, the entire 210 hours of labor from Phase II should be removed.[15]   (Tr. 174-76.)   Specifically, Metrotec argued that because HRMC failed to articulate during its case-in-chief the number of hours expended solely for cutting, see supra note 5, HRMC did not meet its burden of proof under TechDyn Systems, and Metrotec is therefore entitled to summary judgment on this issue. Id.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to

---

of the pipelines from the pier and loading on the barge to be accomplished by others.   Id.   The estimate did include anticipated prices on cold-cutting equipment rentals and various overhead expenses.   Id.   This ultimately formed the basis for HRMC's estimate of the cost and hours of the Pier YK-200 project using the "cold cut" method (though the Court notes that, in actuality, the estimate was Pipeline Petroleum Services, Inc.'s estimate).

[15]The Court notes that removing the costs for the 210 hours of labor from Phase II results in a "hot cut" technique cost estimate of $11,848.40.   This analysis was verified during the cross-examination of HRMC's McFann.   (Tr. 142-46.)

judgment as a matter of law." Fed. R. Civ. P. 56(c).  For the evidence to present a "genuine" issue of material fact, it must be "such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  Facts are deemed material if they might affect the outcome of the case.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  In other words, the moving party's submission must foreclose the possibility of the existence of facts from which it would be open to a jury to make inferences favorable to the non-movant.  Id.

In deciding a summary judgment motion, the court must view the record as a whole and in the light most favorable to the non-moving party.  Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985).  "If, however, 'the evidence is so one-sided that one party must prevail as a matter of law,' we must affirm the grant of summary judgment in that party's favor." O'Connor v. Consol. Coin Caterers Corp., 56 F.3d 542, 545 (4th Cir. 1995) (quoting Anderson, 477 U.S. at 251-52).  Moreover, summary judgment must be granted where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial," Celotex, 477 U.S. at 322, as the non-moving party is required to "set forth specific facts showing that there is a genuine issue for trial" with respect to that element.  Fed. R. Civ. P. 56(e).

21

Because the Court has determined that the instant matter can be resolved based on an assumed maximum value of the hot-cut technique ($19,$19,875.87), without the need to establish with certainty the percentage of labor hours devoted to hot-cutting in Phase II, see supra, Section III.A, the Court need not address the efficacy of Metrotec's motion for partial summary judgment vis a vis the application of TechDyn Systems. Accordingly, the Court DENIES the oral motion for partial summary judgment by Metrotec as MOOT.

## D. Determining the "Cold Cut" Costs

The Court must also consider the amount it would have cost to perform the "cold cut" method had the parties followed the original agreement by cold-cutting the pipes. This calculation is subject to some interpretation since this method was not actually used to perform the work at issue here, thus it necessarily involves certain assumptions and estimates. There are two (2) primary sources of information for the Court to consider in analyzing the "cold cut" costs. First, because the parties originally anticipated using this technique in performing the demolition work, there were cost estimates prepared by HRMC and submitted to Metrotec in the course of reaching agreement on the subcontract terms. Those cost estimates ostensibly formed the basis for the final agreement on the subcontract price, and there is nothing in the record to indicate that the costs estimates represented

22

anything other than HRMC's good-faith estimate of the costs to perform the work and Metrotec's good-faith agreement to pay HRMC for the performance of that work.  Second, because HRMC did perform some cold-cutting operations at another location on the pier (not at issue here), the Court can be guided by the costs involved in performing those operations.  Specifically, after the completion of the hot-cutting operations at issue here (but before the parties engaged in the instant litigation), HRMC was tasked with some additional demolition work that involved cutting a few small sections of pipe at the end of the pier.  That additional work was agreed to in the form of a "change order" to the original contract (the "change-order work").  In negotiating the scope of the change-order work, it was decided that HRMC would "cold cut" the pipes to complete that work.[16]  HRMC performed the change-order work using cold-cutting, billed Metrotec for that work, and Metrotec paid HRMC for the work.  Thus, even though there was a much smaller number of cuts in performing the change-order work, the cost for each of those cuts forms at least some basis for establishing the value of what it would have cost to make cold cuts on the pipe in the

---

[16]The testimony was that there were only four (4) to six (6) cuts made in doing the change-order work, but the size of pipes cut were identical to those involved in the main part of the project at issue here.  (Tr. 63.)  Also, the testimony was that cold-cutting was used for the change-order work because of the possibility that fuel remained in those lines, and it was deemed too dangerous to use the torch for hot-cutting in that location.  (Tr. 64.)

demolition work at issue here.[17]

## 1. HRMC's "Cold Cut" Cost Estimate

As discussed, HRMC prepared its own estimate for what it would have cost had the "cold cut" method been used to cut the pipes. (Tr. 111-120; Pl.'s Exh. 2.A.)  That estimate for the cold-cutting was $23,545.50.  (Tr. 119.)  HRMC's McFann based this estimate on the production rate (i.e., the total time allotted for each cut, including set-up and take-down) taken from King's testimony, the anticipated invoice costs for equipment and supplies, and a cold-cutting estimate from Dennis Cobb, the Vice President of Pipeline

---

[17]The Court notes the testimony of HRMC's McFann, arguing against using the cost-per-cut of the cold-cutting in the change-order work because, "this work was minimal cutting at the tail end of the job prior to us getting ready to demobilize.  We had no valid scope, didn't really know when we were going to have access to [the pipes], did not really know what the parameters of doing the work for [sic], so it based on a make-sure-we're-covered situation."  (Tr. 149; see also Tr. 98-100.)  The Court finds this argument unpersuasive.  In preparing the bid estimate for the change-order work (see Joint Exh. 39), HRMC appears to have provided Metrotec with its best estimates for cold-cutting the 14-inch and 18-inch pipes; there is certainly no indication that there were any uncertainties in the scope of work or the accessibility of the pipes to complete the change-order work.  Indeed, it appears that the timing of the change-order work was rather expeditious: HRMC's bid estimate was prepared by McFann (Tr. 146-47) and sent by fax to Metrotec on November 17, 2005 (Joint Exh. 39); Metrotec confirmed its authorization for HRMC to perform the change-order work – at the agreed-upon pricing – by fax to HRMC on November 21, 2005, with instructions to "please proceed with the [change-order] work ASAP."  Id.  It further appears that the change-order work was completed shortly thereafter, over a three-day period that ended by the 1st of December 2005.  (Tr. 123.)

Petroleum Services, Inc (hereinafter "Pipeline Petroleum").[18]   (Tr.
111-120.)   King estimated that cold-cutting a fourteen (14) inch
pipe would require one and one-half (1.5) hours; this number is
comprised of one (1) hour for the actual cutting, and one-half (.5)
hour for the set-up time.   (Tr. 71.)   King estimated that cold-
cutting an eighteen (18) inch pipe would require two (2) hours;
this number is comprised of one and one-half (1.5) hours for the
actual cutting and one-half (.5) hour of set-up time.   (Tr. 71.)
King's estimate paralleled the estimate that Pipeline Petroleum
provided, namely, one (1) hour for cold-cutting the 14-inch pipes,
one and one-half (1.5) hours for cold-cutting the 18-inch pipes,
and one-half (.5) hour setup time for each cut.   (Tr. 114; Pl.'s
Exh. 2.A.)   HRMC used this production rate, and, based on the 136
cuts that HRMC anticipated making between both the 14- and 18-inch
pipes, determined the total labor hours that would have been
required for cold-cutting the pipes.[19]

---

[18]HRMC regularly uses MEANS to produce cost estimates in
construction projects. (Tr. 112-13.) MEANS is a regularly-updated
reference book that provides estimates for doing various types of
work.  Id.  MEANS is a valuable tool relied on by HRMC in the
ordinary course of business and by the industry as a whole. (Tr.
113.)  Cold-cutting, however, is not one of endeavors listed by
MEANS.  Id.  HRMC could not rely on the MEANS estimates for cold-
cutting and, therefore, turned to the expertise of Dennis Cobb and
Pipeline Petroleum Services, Inc., to generate its estimate.  Id.

[19]As discussed supra, HRMC planned on cutting the pipe into 40-
foot sections.  This was meant to facilitate the loading and
carrying away of the pipes on a barge, a barge that could carry
nothing longer than 40 feet.  HRMC, however, could not always cut
the piping in 40 foot sections.  This was due to periodic joints in

HRMC, to determine the unit labor rate that it used in calculating the total labor cost for the cold-cutting referred to above, used a set figure of $21.00 per hour. (Tr. 115.) This figure represented the composite rate of various laborers within a union contracting outfit, and therefore was the figure used for the foreman's hourly rate in determining the cost of the "cold cut" method. Id. McFann, however, on cross-examination, stated that when the costs were calculated for the "hot cut" method, the foreman's time was billed at $22.65 an hour. (Tr. 160.) McFann testified that this figure of $22.65 represented the foreman's actual hourly rate. Id. HRMC's calculations of the "cold cut" method, however, used the lower composite rate of $21.00 for the cost of the foreman. Though this difference is not dispositive here, it is certainly true that HRMC's use of these different figures for the foreman's hourly rate would effectively increase the cost of the "hot cut" method and decrease the cost of the "cold cut" method, a result undeniably to HRMC's advantage.

The Court also recognizes that while the Pipeline Petroleum estimate was based on using a three-person crew, the HRMC estimate

---

some parts of the pipe that prevented HRMC from cutting exactly 40 foot sections. When this occurred, HRMC would cut a portion of the pipe that was slightly shorter than 40 feet to avoid any joint in the piping. This led to a discrepancy in the number of cuts actually made, producing a range of cuts anywhere from 136 cuts to 144 cuts. Because HRMC was not being compensated for each cut made, rather, the subcontract price was based on the totality of the demolition work, there was no attempt made in the pre-litigation stage to record or ascertain the exact number of cuts.

was based on only two (2) workers performing the cuts.  (Tr. 119.)
In fact, because King could both supervise as foreman <u>and</u> assist in
the cold-cutting,[20] and because King (the foreman) would have been
required to be on the job site in any event, HRMC estimated that
only a two-person crew would be needed to perform the cuts, thereby
significantly reducing HRMC's cost of labor for the "cold cut"
method.  (Tr. 119-20.)

HRMC then looked to actual invoices to determine the
equipment rental costs associated with using the "cold cut" method.
The actual invoice costs for supplies and equipment are from the
limited cold-cutting that was done at the end of the pier in
performing the change-order work.  (Tr. 102, 105.)  HRMC then used
these actual invoice costs for the cold-cutting rental equipment
and determined what its cost would have been had it performed all
136 cuts using the cold-cut method over a six-week period.[21]  (Tr.
117-19.)  Using all these factors, HRMC produced a would-have-cost
estimate, had the "cold cut" method been used, of $23,545.50.  (Tr.
119.)

Metrotec, by comparison, alleged several discrepancies within
HRMC's valuation of the "cold cut" method, claiming that the

---

[20]McFann referred to this position as a "working foreman" (Tr.
119), as opposed to a foreman who merely supervises the work.

[21]The six-week period was derived from Cobb's estimate, "his
outline of work and how long he projected this course of work would
take him to do."  (Tr. 117-18).

estimate was artificially lowered.  First, Metrotec pointed out the rental equipment costs that were left out of Cobb's original estimate.  (Tr. 124-28.)  This discrepancy, however, was supposedly remedied by the corrected figure that Cobb provided during his <u>de bene esse</u> deposition.[22]  (Tr. 126.)

Metrotec also pointed out other alleged discrepancies among HRMC's estimated costs for rental equipment; specifically, the cost of an air hose and air compressor necessary when cold-cutting. HRMC used an invoice from Hampton Roads Equipment Leasing, Inc., to show a cost of $159.00 per week for the rental of an air compressor with hose.[23]   (Tr. 157-59; Pl.'s Exh. 2.C.)  Metrotec, however, pointed to Cobb's cold-cut estimate that included a rental cost for the same equipment of $146.00 <u>per day</u>.  (Tr. 158.; Pl.'s Exh. 2.A.) McFann was not able to adequately describe this discrepancy, other than to explain that rental companies use varying rates and time periods to determine equipment rental costs.  (<u>See</u> Tr. 158-59.) While McFann did testify that she did not know the basis on which

---

[22]In reference to Pipeline Petroleum's construction estimate, (Pl.'s Exh. 2.A), Cobb noted during his <u>de bene esse</u> deposition that the value in line 10, $27,211.25, should be changed to $32,642.45.  (Tr. 126-27.)  Cobb acknowledged the error during his deposition and then gave this corrected figure.  <u>Id.</u>

[23]Metrotec also pointed out that, unlike the invoice immediately preceding it in Plaintiff's Exhibit 2.C, the invoice from Hampton Roads Equipment Leasing, Inc., did not bear any stamp showing that it was received in the HRMC office, and also did not bear any of the markings that would indicate that the HRMC office ever approved the invoice for payment.  (<u>See</u> Tr. 157.)

Cobb established his air compressor and hose rental cost estimate (Tr. 159), the Court notes that HRMC used that very cost estimate from Cobb on which to base other figures and computations in its hot- and cold-cutting calculations.  Indeed, it certainly appears that Pipeline Petroleum's estimate was for the most part HRMC's estimate.  While it is apparent from the air compressor and hose estimate that HRMC picked and chose what it wanted to use from Cobb's estimate to assist in its own calculations, HRMC did not always succeed in explaining its reason for doing so.

Metrotec also noted that on page 2 of Cobb's estimate, under the "Labor" heading, 238 hours were listed for the superintendent, while 24 days were projected for the rental equipment.  (Tr. 128-29; Pl.'s Exh. 2.C.)  For 238 hours of labor by the superintendent to be fit within the projected 24-day period of the rental equipment, the superintendent would have to work an average of over eight (8) hours per day.[24]  (Tr. 128.)  Any time worked over eight (8) hours in a single day must be considered overtime.  (Tr. 128-29.)  Metrotec pointed out, however, that nowhere on Cobb's estimate was the payment of overtime wages allowed for.[25]  (Tr. 128.)

Metrotec also attempted to quantify the alleged total number

---

[24]To be exact, 9.92 hours per day.

[25]King testified that any time he worked that exceeded eight (8) hours total in a single day received the standard overtime union wages, or time-and-a-half.  (See Tr. 64-65.)

of cuts. (<u>See</u> Tr. 129.) Cobb's estimate accounted for 136 total cuts. (Tr. 129; <u>See</u> Pl.'s Exhibit 2.C.) King, while first stating that less than 140 total cuts were made (Tr. 53), later testified on cross-examination that "somewhere around" 140 cuts were made (Tr. 69, 129.) This Court finds no major discrepancy between King's two responses, but rather, finds them to be within the accuracy of the information used in the instant analysis. Metrotec did point out that <u>if</u> there were 140 cuts made, any cuts over 136 would not have been reflected in Cobb's estimate, which obviously would have increased the "cold cut" cost estimate. (Tr. 129.) This simply reiterated the fact that HRMC had estimated 136 total cuts and used that figure in preparing its "cold cut" estimate of $23,545.50.

### 2. Metrotec's "Cold Cut" Cost Estimate

Metrotec estimated a maximum cost of $63,398.88 had the entire project been completed using the "cold cut" method. (Tr. 229; Def.'s Exh. 13.) That estimate, prepared by Raj Gowda, (hereinafter "Gowda"), a project manager for Metrotec, was based on actual pricing from the change-order work (Joint Exh. 39), which included HRMC's cost of the cold-cutting performed as a part of the change-order work at the end of the pier.[26] Gowda's estimate showed

---

[26]The Court notes that Gowda's original estimate for the cold-cutting costs, as reflected in his report presented as Plaintiff's Exhibit 11, was $67,801.00. (Tr. 229; Pl.'s Exh. 11.) That estimate was revised during the trial, however, to account for a smaller number of cuts (i.e., 144 cuts, based on a 38-foot pipe-

that it cost $380.09 to "cold cut" a 14-inch pipe, and it cost $500.45 to "cold cut" an 18-inch pipe.  (Def.'s Exh. 11.)

Gowda arrived at these estimates using HRMC's costs in Change Order No. 4 as a guideline.  (Tr. 218-19.)  The documents for the change-order work showed HRMC anticipating a labor cost of $168.00 per cut for the 14-inch pipe, and a $210.00 labor cost per cut for the 18-inch pipe.  (Tr. 220, 224; Joint Exh. 39.)  Gowda used these price figures from Change Order No. 4 to reach the fully-burdened costs in his "cold cut" estimate.  (Tr. 220.)  Gowda used markup percentages representing insurance, tax, and fringe benefits and sales tax on rental equipment that were identical to HRMC's.  (Tr. 221-22.)  Gowda also used markup percentages representing overhead, prime home office overhead, and prime profit.  Id.  All these markup percentages used in Gowda's estimate were, once again, identical to those used by HRMC in Change Order No. 4.  (Tr. 222.)

Using the above labor costs and markup percentages, Gowda finally arrived at his fully-burdened "cold cut" estimates of $380.09 per 14-inch pipe cut, and $500.45 per 18-inch pipe cut. (Tr. 222, 225.)  Then, multiplying the costs per cut times the number of cuts made on that particular size of pipe, Metrotec determined that the "cold cut" method would cost anywhere from

---

length section, instead of the 154 cuts Gowda originally projected), which produced the revised estimate of $63,398.88. (Tr. 225, 229; Pl.'s Exh. 11, 13.)

$59,917.52, based on 136 cuts, to $63,398.88, based on 144 cuts.[27]

The Court notes the advantage of using the costs per cut from the change-order work is that these prices were for the cold-cutting only. (Tr. 225.) Costs for other support work were not included in the Change Order costs. This estimate is not without controversy, however, because arguably there were such a small number of cold-cuts made that the cost-per-cut in doing the change-order work does not accurately reflect what it would have cost to do on the order of 140 cuts. Nevertheless, absent other quantifiable data regarding the cold-cut costs, the Court is persuaded by the fact that these costs reflect the figures agreed to by and between HRMC and Metrotec in negotiating the price for performing the change-order work.

Metrotec also used another method to determine the costs of the "cold cut" method. William Merritt (hereinafter "Merritt"), an engineer and construction manager for Metrotec, used the as-bid costs from HRMC to estimate that the costs of cold-cutting the pipes would have been $63,240.00. (Tr. 191.) Based on the "Schedule of Values" prepared by HRMC that reflected the as-bid

---

[27]The parties disagreed on the total number of cuts needed to disassemble and remove the piping. While ideally the pipes were supposed to be cut into forty (40) foot sections, this proved impossible on certain sections of the pipe where joints or other obstacles were located where the cut should have been made to produce a forty (40) foot section. Thus some sections of the pipes were required to be cut into sections shorter than forty (40) feet. It is contended that the total number of cuts ranged anywhere from 136 to 144 cuts. (See generally, Tr. 248-50.)

costs (Def.'s Exh. 40),  Merritt determined that cold-cutting the 14-inch pipes would have cost a total of $40,800.00 to perform (Id. at line 10), while cold-cutting the 18-inch pipes would have cost a total of $43,520.00 to perform (Id. at line 8; see also Tr. 188-89.)  Therefore, the total estimated "as-bid" costs for using the "cold cut" method throughout the project was $84,320.00.  (Tr. 191.)

This, however, is not the end of the computation.  The $84,320.00 estimate would include all the appurtenant work that went along with cold-cutting the pipes, such as the rigging, covering the pipe ends with plastic, and supporting of the pipes. (Tr. 189-90.)  Thus, once again, to accurately establish the costs of performing the "cold cut" technique, it is necessary to isolate the cost of doing the actual cutting from the remainder of the demolition work.

Merritt then provided an estimate for what portion of the $84,320.00 was attributable solely to the cutting of the pipes. Merritt testified that approximately seventy-five percent (75%) of the as-bid costs would have been attributable to the actual cold-cutting.  (Tr. 190-91.)  Merritt did not prepare a written estimate to support this testimony, but he did provide the basis for the estimate during cross-examination.  (Tr. 199.)  Merritt testified that, based on his own observation, it took from two to three (2-3)

33

hours to do the cold-cut on each section of pipe.[28]  (See Tr. 199-
200.)  Merritt claimed it took another two (2) hours to accomplish
the non-cutting work of the pipe demolition, or, in other words,
the rigging, the plastic on each end of pipe, the torch cutting,
and the unbolting.  (Tr. 199.)  Therefore, using three (3) hours
for the cutting of the end of each pipe to get a total of six (6)
hours of actual cutting, and then two (2) hours for the rest of the
demolition work for each pipe segment, Merritt found that this came
to six (6) hours out of a total of eight (8) hours for the actual
cold-cutting of each pipe section.  (Tr. 199-200.)  Converting
these numbers to percentages, the result of 75% attributable solely
to cutting is achieved.  (Tr. 200.)  Thus, taking 75% of the as-bid
total cost of $84,320.00, Merritt's estimate of the cost of cold-
cutting came to $63,240.00.  (Tr. 191.)

     In contrast to Merritt's estimate, HRMC attempted to provide
its own estimate of what percentage of the work was attributable
solely to cutting through the testimony of Tim Nixon (hereinafter
"Nixon").  (Tr. 38-40.)  Nixon, a field foreman for HRMC, estimated
that out of the as-bid total cost of $84,320.00, only approximately
forty percent (40%) of that total represented the anticipated costs
for the cutting.  (See Tr. 40.)  Nixon likewise testified that all

_____

     [28]Although Merritt originally stated this estimate, he
apparently decided that the actual number was closer to three (3)
hours, as evidenced by his calculations to arrive at the 75%
valuation.

34

of the various steps of demolishing the piping, other than just the cold-cutting itself, constituted approximately sixty percent (60%) of the total demolition of the pipes using the "cold cut" method. Id.  On this basis, HRMC's estimate was that only $33,728.00 (40% of the $84,320.00 total anticipated cost), was attributable to just the cold-cutting of the pipes.[29]  Nixon based his estimate on his own observations of the significant amount of time that was spent on the prep work alone.  (See Tr. 40.)  The Court, however, finds Nixon's testimony to be less than credible on this subject.  His estimate of 40% did not appear to be supported by any quantitative data, and he offered no substantive basis for making that estimate.[30]

---

[29]HRMC also appeared to argue that using the as-bid total cost of $84,320.00 would produce an inflated estimate of the cost of the cold-cutting because these total cost bids are normally "padded" in the event of any unforeseen circumstances that could raise the total cost of the project.  (See, e.g., Tr. 35-38.)  HRMC's argument appears to be that because the as-bid costs are normally substantially higher than the actual costs, the as-bid costs are an inaccurate representation of what the cold-cutting would have cost. This argument, if the Court were to accept it, would suggest that even the estimate of $33,728.00 is too high.

[30]Indeed, it appears that Nixon's estimate was, at best, a "guess" on this issue:

> Q. How much of that [amount] is the cold cutting part of the process, if you can tell me, please?
> A. I honestly, honestly couldn't tell you. I'd be guessing if I said anything.
> Q. So you don't know how much it costs to do the other steps in the process besides the cold cutting?
> A. No, sir, I don't. . . .

The Court also recognizes that in arguing against the efficacy of Metrotec's use of the as-bid cost estimates, HRMC cited General Railway Signal Co. v. Washington Metropolitan Area Transit Authority, 875 F.2d 320 (D.C. Cir. 1989), for the proposition that the use of pricing estimates submitted after the award of a subcontract to determine the "would have" costs is not reliable. In General Railway, the D.C. Circuit stated the general principle that bargained-for and agreed-upon contract prices "presumptively reflect the reasonable costs of doing that work," but recognized that "[federal] courts have consistently rejected efforts to equate bid prices for various portions of work with contract prices. [Because of] judicial recognition that contractors frequently submit unbalanced bids,[31] understating the true costs of one portion of the contract with an offsetting overstatement on a different

> Q. All right.   Does 20 percent of the cost sound about right for all of the other work in the process besides the cold cutting as a ballpark number?
> . . .
> A. . . . I'd have to say it was probably 60 percent, . . .

(Tr. 38-40.)

[31]See, e.g., Victory Const. Co., Inc. v. U.S., 206 Ct. Cl. 274, 510 F.2d 1379, 1387 (Ct. Cl. 1975) (defining an "unbalanced bid" as "one in which the contractor allocates a disproportionate share of indirect costs and anticipated profit to the unit prices bid for those items on which he anticipates an overrun; the object being to reap overgenerous profits should the anticipated overruns materialize.")

portion [of the contract." General Railway, 875 F.2d at 325.  In that case, the court rejected the argument that a subcontractor's bid prices – that were developed and submitted to the general contractor after the subcontract had been negotiated and executed on a lump-sum basis (for use in the general contractor's unit price schedule analysis) – could be used to reflect agreed-upon contract prices.  Id. at 325-26.  The court noted that the bid prices were never intended to reflect the actual costs for the project because, in part, the subcontract was negotiated as a lump-sum contract and the progress payments made under the contract "bore no relationship to the unit price schedule of which the [bid] items were a part." Id. at 325.  The court further found that, even assuming that the bid prices reflected contract prices, the general contractor was able to "defeat the presumption of reasonableness typically accorded contract prices" by establishing that the bid prices were excessively inflated and "unreasonable because they included an enormous 161.5% markup to cover profits and indirect costs."  Id. at 326.  This markup was found to be "wholly disproportionate to the relatively modest indirect costs and the 9.73% profit figure employed in an[other] estimate . . . of the costs of the work that included [the same] elements.  Id.

The instant case is clearly distinguishable from General Railway, however, because the as-bid prices submitted by HRMC were used to establish the total subcontract cost of $84,320.00 that

37

included the cold-cutting operations as part of the demolition. Those as-bid costs were proposed by HRMC, accepted by Metrotec, and formed the basis for the original subcontract value of $84,320.00. Thus, for HRMC to argue at this juncture that the as-bid costs are not reasonable is misplaced.  Instead, the difficulties with using those as-bid costs in the instant case lie in the facts that the cold-cutting was not actually performed in completing the demolition work (apart from the limited amount of cold-cutting associated with the change-order work) and because the as-bid costs did not differentiate the costs associated with the cutting operations from the other work necessary to complete the demolition.  As such, any attempts to use those as-bid costs to establish the costs of the cutting operations necessarily require certain assumptions, see supra, but that does not suggest the as-bid costs themselves should be "condemned as unreasonable" under General Railway.  Id.

### E.  **The Court's Cost Estimates**

The Court repeats the matter at issue in the present case: quantifying the savings associated with the change from the "cold cut" technique to the "hot cut" technique with respect to the demolition of the fuel lines on the Pier YK-200 project.  This necessarily involves determining cost estimates for both the "hot cut" and the "cold cut" techniques.  Both sides have provided their own computations and analyses for establishing those costs:

38

| Cutting Technique Cost Estimate | Hot-Cutting | Cold-Cutting (Actual) | Cold-Cutting (As-Bid) |
|---|---|---|---|
| HRMC | $19,875.87 | $23,545.50 | $33,728.40 |
| Metrotec | $11,848.40 | $59,917.52 – $63,398.88 | $63,240.00 |

The Court has discussed in detail, _supra_, the genesis of each of these estimates.

As discussed, the Court has determined that a reasonable basis for resolving the present issue is to assume that HRMC's estimate of $19,875.87 represents the cost of performing the hot-cutting,[32] _see supra_, Section III.A, and then determine if the cost of performing the cold-cutting is greater than or equal to $49,805.54, the sum of the "hot cut" costs ($19,875.87) plus the retainer amount ($29,929.67).  To the extent the Court determines, as is the

---

[32]The Court notes, as the parties appear to concede, that HRMC's cost estimate of $19,875.87 appears to be the maximum cost of the hot-cutting, as it includes all of the labor costs in both Phase I and Phase II, _see supra_, Section III.C and note 28.  The Court further notes that Metrotec's cost estimate of $11,848.40 appears to be the minimum cost of the hot-cutting, because Metrotec seeks to exclude _all_ of the labor costs in Phase II on the basis that HRMC failed to meet its burden of establishing what portion of those costs are attributable only to the hot-cutting of the pipes, _see supra_, Section III.C.3.  Accordingly, the Court recognizes that the true costs for the hot-cutting lies somewhere in between these values.  However, the Court need not address the issue further because the instant case can be adequately resolved using the value that the parties do agree on, namely, that the maximum cost of the hot-cutting was $19,875.87.  Using this value puts HRMC in the most advantageous position, providing the opportunity to recover the greatest amount of the $29,929.67 retainer that HRMC could be entitled to recover

case here, that the costs of the "cold cut" work exceeds
$49,805.54, then Metrotec is entitled to receive the entire amount
of the retainer.   The Court has determined that the figures
proposed by Metrotec, ranging from $59,917.52 to $63,398.88, based
on the "actual costs" of the cold-cutting represent the most
accurate estimates for the cost of cold-cutting the pipes.

### 1. Assessment of HRMC's "Cold Cut" Cost Estimates

HRMC estimated a total "cold cut" method cost of $23,545.50.
In arriving at this estimate, McFann used selected values from
Cobb's cold-cutting estimate, invoice costs and supplies, and the
production rate from King's testimony.

The Court finds that several discrepancies cut against the
validity of HRMC's "cold cut" method evaluation.  First, HRMC used
a lower hourly rate for the cost of the foreman in its "cold cut"
analysis than in its "hot cut" analysis.   This would effectively
lead to a lower "cold cut" estimate and a higher "hot cut"
estimate, a result clearly in HRMC's favor.   HRMC was unable to
provide a satisfactory explanation for this selection.

Second, HRMC's cost estimate for the rental of an air
compressor and hose was significantly less than Cobb's estimate for
the same equipment.   When asked to explain the vast difference in
rental cost, HRMC's McFann merely stated that rental companies use
different rates.   The difference between the two rental cost
estimates, however, were substantially different, with HRMC's

40

estimate suggesting that it could rent an air compressor and hose for one <u>week</u> for the same amount that Pipeline Petroleum's Cobb estimated it would cost to rent that same equipment for a single <u>day</u>.   The Court also finds it telling that HRMC chose to significantly rely on Cobb's estimate in arriving at its own "cold cut" evaluation, but yet substituted its own equipment cost estimates, a substituted cost that was significantly less than what Cobb's estimate called for and clearly advantageous to HRMC's position.

Third, the Court finds it problematic that HRMC did not allow for any overtime costs in its "cold cut" method evaluation.  For example, the evidence before the Court suggested that the number of labor hours attributable to the "working foreman" within the projected 24-day rental equipment period, using the production rate established by the evidence, would have required the foreman to work more than an eight (8) hour day on some days.  This time exceeding eight (8) hours in a given day would have required overtime pay.  HRMC's estimate, however, did not provide for such overtime payment, thereby, once again, effectively reducing HRMC's "cold cut" method evaluation.

### 2. Assessment of Metrotec's "Cold Cut" Cost Estimates

Metrotec, by comparison, arrived at its evaluation of the "cold cut" cost estimate by using <u>actual</u> <u>costs</u> from the change-

order work.[33]   The price-per-cut in Change Order No. 4 was determined from the cold-cutting costs at the end of the pier. Using these <u>actual</u> <u>costs</u> from Change Order No. 4, Metrotec estimated a "cold cut" method cost from $63,398.88, using 144 cuts, to $59,917.52, using 136 cuts.  The Court need not establish the precise number of cuts made because, whether there were 136 or 144 cuts made, the Metrotec cost estimates based on the actual costs exceeds the threshold value of $49,805.54, <u>see supra</u>.

While the various approaches that were proposed by the parties all required some assumptions, to an extent, the Court finds that Metrotec's "cold cut" evaluation involves the least assumptions and is therefore the most accurate and reliable estimate.  Those costs were based on the actual agreed-upon prices for cold-cutting both the 14-inch and the 18-inch pipes at the end of the pier.  These prices were used to develop the fully-burdened costs that HRMC would have likely passed on to Metrotec had the "cold cut" method been used to perform the instant demolition work.  Significantly, Metrotec's estimate was squarely based on the <u>actual</u> costs of <u>cold-cutting</u> that had been performed on the end of the pier – work that was performed by HRMC, and paid for by Metrotec, using essentially

---

[33]The Court notes that Metrotec also proposed a second method to determine the cost of the cold-cutting, based on the "as-bid" cost estimates developed by Merritt, however, the Court finds it unnecessary to evaluate the efficacy of this second method. Nevertheless, that estimate was close to the actual-cost estimates that the Court relies on here.

the same job personnel and equipment that would have been required
to perform the cold-cutting operations.

The Court therefore holds that HRMC is entitled to none of the
$29,929.67 retainage amount.  Because the Court finds that the
savings incurred from using the "hot cut" method in place of the
"cold cut" method were greater than the $29,929.67 amount in
dispute, the Court finds in favor of Metrotec and ENTERS JUDGMENT
for Metrotec in the amount of $29,929.67.

## IV. **CONCLUSION**

The Court has determined that HRMC's motion for discovery is
DENIED, <u>see supra</u> note 4, as the deposition at issue has been
completed and offered into evidence.  The Court has also DENIED
Metrotec's motion for partial summary judgment as MOOT, <u>see supra</u>
Section III.C.3, because the Court has resolved the instant issue
in this case without requiring the allocation of labor hours
devoted to hot-cutting of the pipes in the second phase of the
demolition project.  Based upon the evidence as a whole, and
considering the credibility of the witnesses, the Court has
determined that the difference in costs between the cold-cutting
technique and the hot-cutting technique exceeds the retainage
amount of $29,929.67.  This analysis was based upon the assumption
that the "hot cut" costs were $19,875.87, as proposed by HRMC,
without consideration of any reduction of that amount as asserted
by Metrotec due to HRMC's inability to isolate the costs of the

hot-cutting operations in the second phase of the demolition.  The Court has further determined that the most accurate and reliable cost estimates for the "cold cut" costs are, as Metrotec proposed, between $59,917.52 and $63,398.88.  Those cost estimates, while varying depending on the exact number of cuts made, are based upon actual pricing for cold-cutting of the pipes during the change-order work – prices that reflect agreed-upon values between HRMC and Metrotec in the negotiation of Change Order No. 4.  To the extent practical, those prices do not include labor for work other than the cold-cutting, hence there are minimal inaccuracies and assumptions involved.  Because the cost estimates for the cold-cutting far exceeds the threshold value of $49,805.54, the sum of the "hot cut" costs ($19,875.87) and the retainage amount ($29,929.67), the Court FINDS that HRMC is entitled to none of the retainer and further FINDS that Metrotec is entitled to the entire balance of the retainer.  Accordingly, the Court hereby ENTERS JUDGMENT for Metrotec in the amount of $29,929.67.

## V.  ORDER

For the foregoing reasons, having DENIED HRMC's motion for discovery and having DENIED Metrotec's motion for partial summary judgment as MOOT, the Court FINDS that HRMC is entitled to none of the retainer and further FINDS that Metrotec is entitled to the entire balance of the retainer.  Accordingly, the Court hereby ENTERS JUDGMENT for Metrotec in the amount of $29,929.67.

44

The Clerk shall mail a copy of this Order to all counsel of record.

Entered on June 13, 2007

                                        _____/s/_____
                                        F. Bradford Stillman
                                        United States Magistrate Judge